Richard H. Greener (ISB No. 1191)
*rgreener@parsonsbehle.com*
Slade D. Sokol (ISB No. 8684)
*ssokol@ parsonsbehle.com*
PARSONS BEHLE & LATIMER
800 W. Main Street, Suite 1300
Boise, ID 83702
Telephone:      (208) 562-4900
Facsimile:       (208) 562-4901

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT COURT OF IDAHO

| | |
|---|---|
| KIRK EIMERS, individually and as the Personal Representative of The Estate of Helen Louise Eimers; BART EIMERS, individually and on behalf of his minor children C.E., R.E., C.E., and J.E.; TARA EIMERS-BEAN, individually and on behalf of her minor child Z.B.; and MASON EIMERS-BURKLAND, individually, <br><br> Plaintiffs, <br><br> vs. <br><br> CHIPOR HOLDINGS, LLC, an Oregon limited liability company, d/b/a ORANGE TORPEDO TRIPS; and DOES 1-10, inclusive, <br><br> Defendants. | Case No. _____ <br><br><br> **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

Plaintiffs Kirk Eimers, individually and as the Personal Representative of The Estate of Helen Louise Eimers, deceased, Bart Eimers, individually and on behalf of his minor children C.E., R.E., C.E., and J.E., Tara Eimers-Bean, individually and on behalf of her minor child Z.B., and Mason Eimers-Burkland, individually (collectively, "Plaintiffs"), by and through their counsel of record, Parsons Behle & Latimer, hereby allege as follows:

# I. PARTIES

1.      Plaintiff Kirk Eimers is, and at all times material hereto was, a resident of the State of Idaho.  Plaintiff Kirk was the husband of the deceased, Helen Louise Eimers, and is the Personal Representative of The Estate of Helen Louise Eimers.

2.      Plaintiff Tara Eimers-Bean is, and all times material hereto was, a resident of the State of Idaho, and was the daughter of the deceased, Helen Louise Eimers.  Tara is the natural parent of minor Z.B, the grandchild of the deceased, Helen Louise Eimers.

3.      Plaintiff Mason Eimers-Burkland is, and all times material hereto was, a resident of the State of Idaho, is the son of Tara, and was the grandchild of the deceased, Helen Louise Eimers.

4.      Plaintiff Bart Eimers is, and at all times material hereto was, a resident of the State of Idaho, and was the son of the deceased, Helen Louise Eimers.  Bart is the natural parent of minors C.E., R.E., C.E., and J.E., the grandchildren of the deceased, Helen Louise Eimers.

5.      Defendant Chipor Holdings, LLC, is, and at all times material hereto was, an Oregon limited liability company duly authorized to do business and doing business in the State of Idaho under the assumed business name of "Orange Torpedo Trips." ("Orange Torpedo").

6.      Plaintiffs allege that the true identities and capacities of the individuals and/or entities sued herein by the fictitious names "Does 1 through 10, inclusive" are presently unknown to Plaintiffs, but that, on information and belief, said fictitiously named defendants are responsible for, and/or contributed to, the damages suffered by Plaintiffs as alleged herein.  Plaintiffs will seek leave of Court to amend this Complaint to properly allege claims against said defendants when their true identities and capacities have been ascertained.

## II. JURISDICTION AND VENUE

7. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, which provides for original jurisdiction in cases in which there is diversity of citizenship between parties and the amount in controversy exceeds $75,000.00.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the events, acts and omissions giving rise to this lawsuit occurred in Idaho County, Idaho, and the State of Idaho has an interest in its citizens' safety when they participate in outdoor activities that it regulates.

## III. FACTS

### A. Introduction.

9. This complaint alleges negligence on the part of a whitewater river outfitter, its manager, and its guide who took a group of guests on a river trip that ended with the death of Helen Louise Eimers.

### B. The Outfitter, its Manager, the Guide, the Eimers Group, and the River.

10. Chipor Holdings, LLC d/b/a Orange Torpedo Trips (the "Outfitter") is a licensed outfitter in the State of Idaho that sells guided rafting tours on the Salmon River to the public.

11. The Outfitter employed Aaron Lieberman as a guide in 2009. By 2018, he had become the manager (the "Manager") of the Outfitter's operations in Riggins, Idaho. By August, 2018, he had been a licensed guide for the Outfitter for nine years; he was among the Outfitter's most experienced guides.

12. The Outfitter employed Anne Eimers (a distant relative of the Plaintiffs) as a guide (the "Guide") in June, 2018. She held a wilderness first aid certificate. To earn that certificate, she had to demonstrate competence (i) to perform a patient assessment, (ii) to recognize respiratory distress and drowning, and (iii) to perform CPR. She was 23 years old.

13. In mid-August, 2018, Helen made a reservation with the Outfitter for herself, her husband Kirk, and four of their friends (the "Eimers Group") to float a 10-mile section of the Salmon River between Riggins and Lucile, Idaho (the "Riggins Section").

14. The Eimers Group ranged from late 60s to mid-70s in age. Three of them had patently obvious or easily discoverable medical issues, physical limitations, and disabilities. Helen, who had very recently beat her lymphoma into remission, still had her chemotherapy port in place in her shoulder. Her husband Kirk was legally blind. And Greg Fredricks had difficulty walking without assistance, due in part to being overweight. His right knee was in a brace.

15. Few of the members of the Eimers Group had significant wilderness experience. None had swum whitewater. None were familiar with the Riggins Section. They had no particular reason to want to run the Riggins Section. All they wanted to do was spend a day together celebrating Helen's remission.

16. The Riggins Section—which is surrounded by the federal "River of No Return" wilderness area—is navigable but challenging because of its half-dozen rapids. The most significant of these is Traps Creek rapid, where a bend in the river is clogged by a dozen or more car-sized boulders. The BLM's booklet, "The Lower Salmon River, Boater's Guide," describes Traps Creek rapid as follows: "Traps Creek [Class] III-IV.  Higher flows create a large wave train, but, as the water level drops, holes form and rocks are exposed which require some maneuvering."

17. Highway US-95 follows the Salmon River throughout the Riggins Section. There is boat ramp access to the river in several places, and the section is generally accessible to helicopters.

**C. Events before the Incident.**

18. On the morning of August 28, 2018, the Eimers Group arrived at the Outfitter's headquarters in Riggins, on the shore of the Salmon River. The Manager met and checked them in. On that day, the River's level was very low, with many holes and rocks exposed in the river's rapids. The river water was chilly.

19. The Manager decided to send the Eimers Group through the Riggins Section in a single rubber raft with a single guide. The raft was configured as a hybrid rowboat and paddle raft. It was rigged to accommodate up to six paddlers in the bow and middle sections of the raft, and a rower in the stern.

20. The Manager assigned the Guide to be the rower in the stern and "paddle captain" of the raft. As the paddle captain, the Guide would give instructions to the Eimers Group, telling them when, in which direction, and how hard, to paddle.

21. The Manager and the Guide expected the Eimers Group to provide power and steering to the hybrid raft. Without their assistance, that raft would be substantially more difficult for the Guide to control.

22. The raft was not rigged with "chicken lines," ropes that guests can hang onto to help them stay in the raft in rough water.

23. The Outfitter's 2015 "Operating Plan" declares that the Outfitter

> reserve[s] the right to determine that we do not have the proper training, equipment, or ability to safely take someone down a specific section of river based on their unique physical, mental, or emotional limitations.

24. Given his substantial experience as a guide, the Manager knew or should have known that it was unwise and unsafe to send the Eimers Group with the Guide on the Riggins Section. It was too risky.

25. At least, the Manager knew or should have known that it was unwise and unsafe to take the Eimers Group on the Riggins Section in that hybrid raft: (i) the Eimers Group was obviously unfit to power or steer the raft by paddling, and (ii) several of them clearly needed to be holding onto chicken lines (rather than paddling) in the rough whitewater that lay downriver.

26. At very least, the Manager knew or should have known that it was unwise and unsafe to take the Eimers Group on the Riggins Section without the support of a second raft with a second guide. If one or more of the Eimers Group became separated from the rest, a second guide could attend to them. If two or more of the Eimers Group ever needed emergency assistance simultaneously, a second guide would be necessary because the Guide was unqualified to provide that assistance adequately, much less on her own.

27. In any event, given the physical limitations and whitewater inexperience of the Eimers Group, the Manager and the Guide should never have allowed them onto the Riggins Section without first giving them a stern and detailed warning about the inherent risks of that section. However, the Outfitter, the Manager, and the Guide never gave the Eimers Group any warnings about any such risks.

28. To be clear, the Manager did require the members of the Eimers Group to sign a form liability release on the day of the trip. But that form contained no warnings about any risks in the Riggins Section, such as the possibility of being washed out of the raft and submerged in rocky whitewater. It said nothing about whitewater or rivers. Instead, it gave a generic warning that is so overbroad that it is virtually meaningless:

> certain dangers may arise resulting from . . . participation, including but not limited to, death, serious neck and spinal injuries resulting in paralysis, and injury to virtually all bones, joints, muscles, and internal organs.

The Outfitter's form release did not include any warnings about the actual risks that the Eimers Group was going to face in the Riggins Section of the Salmon River. And the Manager did not give any such warnings while the Eimers Group signed those releases in his presence.

29. Despite all this, in the early afternoon of August 28, 2018, the Manager launched the Eimers Group and the Guide onto the Riggins Section a hybrid boat on their own.

**D. The Incident.**

30. Mid-afternoon that day, the Guide steered her raft into Traps Creek rapid. In low water, this rapid begins with a sharp "hole" in the middle of the river. (A hole is a breaking wave immediately downstream from a barely submerged boulder.) The top hole in Traps Creek rapid is renowned as a "boat flipper."

31. The Guide knew or should have known to take a proper (safe) line and steer the raft around the top hole, especially with the Eimers Group aboard. Furthermore, the Guide knew or should have known not to hit that hole without being "squared up" (pointing the nose of the raft perpendicular to the hole). She knew or should have known that hitting that hole without being squared up could result in one or more of her guests being washed into the river.

32. But the Guide allowed her raft to hit that hole without being squared up.

33. The raft spun sideways in the hole and the wave broke over the side of the raft. The wave washed everyone overboard, including the Guide. Some of the Eimers Group recall being held for some time under water under the raft. For the next several minutes, they all floated in their lifejackets—helplessly out of control—over, around, and through all the rocks, holes and waves of Traps Creek rapid.

34. It was a brutal experience. During her own swim through Traps Creek rapid that day, Eimers Group member Nancy Fredericks was under the raft for some time and slammed by

the full force of the Salmon River into a mid-stream boulder. She suffered a serious hip contusion for which she was transported to the hospital in McCall, Idaho. She later recalled that at one point during her ordeal she thought she was dead.

35. At that time, the Guide knew or should have known that every member of the Eimers Group was at risk of serious injury or drowning.

**E. Events after the Incident.**

36. Below the rapid, the Eimers Group was dispersed in the river and Helen was left behind, upstream of the others. The Guide collected those who were downstream first—one at a time because she had no help—and hauled each of them back into the raft. The Guide then rowed back upstream to where Helen had been taken to shore by another guide with a different outfitter.

37. It took the Guide ten minutes or longer to reunite with Helen after everyone had been washed out of the raft into the river.

38. When the Guide finally got back to Helen, she found that Helen was disoriented, hurt, and did not even have the strength to stand up. Kirk asked his wife if she was okay, but she replied that she "didn't know." Helen repeatedly stated that she "needed oxygen" and that she "couldn't breathe."

39. The other guide told the Guide that Helen was "impaired." "She's not ok," he stressed.

40. Given her wilderness first aid training, the Guide knew or should have known that Helen was in respiratory distress because she had inhaled river water into her lungs. And she knew or should have known that respiratory distress and an impaired mental status after inhaling river water are bright red flags of imminent death.

41. The Guide knew or should have known that the situation was critical and Helen required immediate first aid.

42. But despite her training the Guide did not provide any first aid to Helen. She did not make any apparent effort to engage with Helen and assess her condition. Notwithstanding that Helen was elderly and had been submerged in cold water, the Guide made no effort to dry Helen and re-dress her in warm clothing, which could have conserved her energy and prolonged her life. The Guide did not reassure Helen, which could have reduced her anxiety and respiration rate, which could have decreased the rate of damage being done to her lungs by the river water in them.

43. The Guide did not provide these basic first aid measures to Helen, nor did she direct any other member of the Eimers Group to do so.

44. Given her training, the Guide also knew or should have known that respiratory distress and impaired mental status after inhaling river water required Helen's immediate and urgent evacuation. But despite her training the Guide did not immediately initiate an urgent evacuation.

45. Instead, she had a too-long satellite phone call with the Manager.

46. That call violated the Outfitter's written Emergency/Action Plan (the "EAP"), which the Manager and the Guide were required by the Outfitter to know and follow. That plan required the Guide to call the sheriff first. Next, it required her to call the Outfitter's designated agent, Eric Weisman. Only if she was unable to reach Eric was she supposed to call the Manager.

47. The EAP clearly required the Guide to "work with [the] sheriff" (not the Manager) "to develop [the] evacuation plan." That is why the Outfitter's EAP required the Guide to call the sheriff first, not the Manager: The sheriff would have known better than the Guide or the Manager

whether an ambulance was available, or if life-flight was a better option, and where the best rendezvous point would be for either.

48. Regardless, during the Guide's call with the Manager, she did relay to him Helen's husband's urgent request for an ambulance. But the members of the Eimers Group remember that the call—which violated the EAP but, once made, should have been short and crisp so the Manager could call the ambulance—took a significant and unnecessary amount of time. The Guide was frantic and panicked. It was evident to the remaining Eimers Group that she understood that the situation was critical, but she did not know what to do.

49. At least another ten or fifteen minutes had passed.

50. Eventually, the rest of the Eimers Group helped Helen back to, and lay her down in, the Outfitter's raft. The Guide then rowed them downstream toward a primitive boat ramp off US-95 at Jackass Flats.

51. That took another twenty or thirty minutes.

52. During that time, Helen repeatedly asked, "how much longer?" and "when are we going to get there?" "I can't breathe," she said, and "I need help," Still, the Guide did not give any first aid. She did not reposition Helen to make it easier for her to breathe. She did not engage with her or try to reassure her that help was on the way.[1]

53. Helen stopped breathing just a moment before they all arrived in the raft at Jackass Flats. The Guide did not perform CPR.

---

[1] In the meantime, the Manager contacted Marisa Mirviss, a guide for another outfitter, and he asked her to take a medical kit to Traps Creek rapid and help the Guide. Marisa missed the group at Traps Creek but rendezvoused with them at Jackass Flats.

### F. Events at Jackass Flats.

54. Someone called 911 for help. That was the first call to 911 about this incident.

55. Bill Lenhart (an emergency medical technician with an ambulance) responded to that call arriving ten minutes later at Jackass Flats. He reported that Helen "was not breathing when they called 911 which means she had not been breathing for 15 minutes when we got there."

56. By then it was too late.

57. After several futile attempts to revive her—including shocking her with an AED and performing CPR—all Bill Lenhart could do was radio deputy sheriff Andrew Beene and report to him that Helen had died. That was the first call to the sheriff's department about this incident.

58. Deputy Beene arrived at the scene a few minutes later, but all he could do was officially declared that Helen was dead.

59. Helen's Certificate of Death lists the immediate cause of her death as "cold water drowning due to rafting accident."

### IV. CAUSES OF ACTION

60. Outfitters and guides licensed in Idaho are civilly liable for damages and injuries directly or proximately caused by their failure to comply with the duties placed on them by Idaho law.

61. Under Idaho law, outfitters have a duty to exercise ordinary care to prevent unreasonable, foreseeable risks of harm to others. That duty includes exercising due care in the hiring, training, and supervision of guides. It includes exercising due care in the design and execution of guided activities.

62. Guides have the same duty as outfitters under Idaho law—to exercise care and prevent harm. They are further required to conform to the standard of care expected of members of their profession.

63. Outfitters are vicariously liable for their guides' acts and omissions in the course and scope of their employment.

64. Thus, in Idaho, outfitters are liable when they fail to exercise ordinary care or when their guides fail to exercise such care or fail to meet the standards of care expected of them.

65. <u>The standard of care expected of guides (and therefore outfitters) in Idaho includes a duty to perform at least a superficial assessment of the physical fitness of their guests</u>. The Manager and the Guide failed to meet this standard, and they breached that duty, when they failed to recognize the obvious ages, medical issues, and physical limitations of the Eimers Group.

66. <u>The standard of care expected of guides (and therefore outfitters) in Idaho includes a duty to ask their guests about their prior relevant outdoor experience when the guide has concerns about their fitness</u>. A guest who superficially appears unfit, but who has prior relevant outdoors experience, is likely competent to decide whether to participate in similar risky outdoor activities. A guest with no such experience is unlikely competent to make that decision. The Manager and the Guide failed to meet this standard, and they breached that duty, when they failed to ask about and consider the prior whitewater experience of the Eimers Group, given that several of them were obviously unfit to be swimming in whitewater.

67. <u>The standard of care expected of guides (and therefore outfitters) in Idaho includes a duty not to take guests on whitewater river sections that will expose them to significant risks—given their fitness and experience—without taking necessary precautions</u>. For example, outfitters

and guides routinely decline, for health and safety reasons, to take inexperienced children on river trips. The Manager and the Guide failed to meet this standard, and they breached that duty, when:

    a. They took the Eimers Group on the Riggins Section even though the Outfitter had expressly reserved the right to decline to do so in its Operating Plan;

    b. They failed to move the Eimers Group's trip to a safer section anywhere else along the 30+ miles of river with US-95 access between Riggins and White Bird, Idaho;

    c. They sent the Eimers Group on the Riggins Section with a guide who was insufficiently trained and insufficiently experienced to manage a critical emergency on her own;

    d. They failed to send a second raft with a second guide who could have attended to Helen when she became separated from the rest of the group; and/or

    e. They failed to rig the Guide's raft with chicken lines and a center-mounted rowing frame, which configuration would not have required the Eimers Group to assist the Guide as paddlers, so they could, instead, hold onto the lines and stay in the raft.

68. <u>The standard of care expected of guides (and therefore outfitters) in Idaho includes a duty adequately to warn their guests about inherent risks so those guests can make informed decisions about whether or not to participate.</u> Given the unfitness and inexperience of the Eimers Group, the Outfitter, the Manager, and the Guide failed to meet this standard, and they breached that duty, when:

    a. They failed to warn the Eimers Group adequately about the specific risks of the Riggins Section; and/or

    b. They attempted to insulate themselves from all liability with a generic and self-serving liability release form that identified none of the specific risks of the Riggins Section for which the Outfitter sought to be released.

69. <u>The standard of care expected of guides (and therefore outfitters) in Idaho includes a duty to be able to navigate whitewater safely.</u> The Guide failed to meet this standard, and she

breached that duty, when she hit the top hole in Traps Creek rapid with the raft not squared up, which resulted in everyone being washed overboard into rocky whitewater.

70. <u>The standard of care expected of guides (and therefore outfitters) in Idaho includes a duty to be able to provide at least standard first aid</u>. Standard first aid for victims in respiratory distress includes: proper positioning of the victim, reassurance, oxygen if available, and CPR when necessary. Standard first aid for victims who have been submerged in cold water (especially if they are elderly and infirm) includes warming the victim. Despite her wilderness first aid training, the Guide failed to meet this standard, and she breached that duty, when she failed to provide (or cause anyone else to provide) *any* first aid to Helen.

71. <u>The standard of care expected of guides (and therefore outfitters) in Idaho includes a duty to be able to immediately execute an urgent evacuation</u>. Respiratory distress and impaired mental status both require an immediate and urgent evacuation. The Manager and the Guide failed to meet this standard, and they breached that duty, when their decisions and actions unnecessarily delayed Helen's evacuation:

   a. The Manager and the Guide spent too much time on the phone, which (a) delayed the Manager from contacting the sheriff, and (b) further delayed the Guide from expediting Helen's evacuation;

   b. The Guide called the Manager instead of the sheriff;

   c. The Manager called Marisa Mirviss instead of the sheriff or 911; and

   d. No one called 911 or the sheriff until after Helen stopped breathing.

72. <u>The standard of care expected of guides (and therefore outfitters) in Idaho includes employees following their outfitters' emergency action plans.</u> Outfitters in Idaho are expected to formulate these plans thoughtfully and execute them exactly to keep their guests safe. The Outfitter failed to meet this standard, and it breached that duty, when it failed to cause the Manager and the

Guide to know its EAP and execute it properly. The Manager and the Guide breached that duty by deviating from the EAP when:

    a. The Guide called the Manager instead of the sheriff;

    b. The Manager called Marisa Mirviss instead of the sheriff or 911;

    c. The Manager and the Guide failed to assure that the Guide worked with the sheriff (not the Manager) to develop the plan to evacuate Helen; and

    d. No one called 911 or the sheriff until after Helen stopped breathing.

73. With respect to the Eimers Group, the Outfitter, the Manager, and the Guide failed to meet the standards of care expected of guides and outfitters in Idaho. These breaches were not slight, they were profound.

74. The events set into motion by the Outfitter's, the Manager's, and the Guide's failures and breaches were all easily foreseeable by the Outfitter, the Manager, and the Guide.

75. Helen Eimers died as a direct and proximate result of the Outfitter's, the Manager's, and the Guide's negligent, reckless, and wrongful conduct, breaches of duty, and failures to meet the applicable standards of care.

76. As a direct and proximate result of the Outfitter's, the Manager's, and the Guide's negligent, reckless, and wrongful conduct and multiple breaches of the standards of care, Plaintiff Kirk Eimers suffered, and continues to suffer, emotional and psychological distress from watching his wife die, as well as the loss of love, affection, and support of his wife, Helen, and the destruction of the husband-wife relationship.

77. As a direct and proximate result of the Outfitter's, the Manager's, and the Guide's negligent, reckless, and wrongful conduct and breaches of the standards of care, Plaintiffs Bart Eimers, C.E., R.E., C.E., J.E., Tara Eimers-Bean, Z.B., and Mason Eimers-Burkland suffered, and continue to suffer, emotional and psychological distress from the death of Helen, as well as the

loss of love, affection, and support of Helen, a mother, and grandmother, and the destruction of the parent-child and grandparent-grandchild relationships.

78. As a direct and proximate result of the Outfitter's, the Manager's, and the Guide's negligent, reckless, and wrongful conduct and breaches of the standards of care, Plaintiffs have suffered damages well in excess of the jurisdictional minimum, the amount of which will be proven at trial.

79. Because of the negligent, reckless, and wrongful nature of the Outfitter's, the Manager's, and the Guide's conduct, the Plaintiffs shall not be limited to any statutory cap on damages.

## REQUEST FOR JURY TRIAL

Plaintiffs hereby respectfully demand a trial by jury as to all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREBY, Plaintiffs hereby request the following relief:

1. The Court award Plaintiffs damages, in excess of $75,000, to be proven at trial; and
2. For such other and further relief as the Court deems just and proper.

DATED this 24th day of February, 2020.

PARSONS BEHLE & LATIMER

By: _____
Richard H. Greener / Slade D. Sokol
Attorneys for Plaintiffs